# United States Court of Appeals
## For the Eighth Circuit
_____

No. 22-1422
_____

Red River Valley Sugarbeet Growers Association; United States Beet Sugar Association; American Sugarbeet Growers Association; Southern Minnesota Beet Sugar Cooperative; American Crystal Sugar Company; Minn-Dak Farmers Cooperative; American Farm Bureau Federation; American Soybean Association; Iowa Soybean Association; Minnesota Soybean Growers Association; Missouri Soybean Association; Nebraska Soybean Association; South Dakota Soybean Association; North Dakota Soybean Growers Association; National Association of Wheat Growers; Cherry Marketing Institute; Florida Fruit and Vegetable Association; Georgia Fruit and Vegetable Growers Association; National Cotton Council of America; Gharda Chemicals International, Inc.

*Petitioner*s

v.

Michael S. Regan, Administrator, U.S. Environmental Protection Agency; U.S. Environmental Protection Agency

*Respondent*s

------------------------------

CropLife America; State of North Dakota; State of Missouri

*Amici on Behalf of Petitioner*

League of United Latin American Citizens; Pesticide Action Network; Natural Resources Defense Council; California Rural Legal Assistance Foundation; The Farmworker Association of Florida; Farmworker Justice; GreenLatinos; Labor Council for Latin American Advancement; Learning Disabilities Association of

America; National Hispanic Medical Association; Pineros y Campesinos Unidos del Noroeste; United Farm Workers; United Farm Workers Foundation

*Amici on Behalf of Respondent*

_____

No. 22-1530

_____

Red River Valley Sugarbeet Growers Association; United States Beet Sugar Association; American Sugarbeet Growers Association; Southern Minnesota Beet Sugar Cooperative; American Crystal Sugar Company; Minn-Dak Farmers Cooperative; American Farm Bureau Federation; American Soybean Association; Iowa Soybean Association; Minnesota Soybean Growers Association; Missouri Soybean Association; Nebraska Soybean Association; South Dakota Soybean Association; North Dakota Soybean Growers Association; National Association of Wheat Growers; Cherry Marketing Institute; Florida Fruit and Vegetable Association; Georgia Fruit and Vegetable Growers Association; National Cotton Council of America; Gharda Chemicals International, Inc.

*Petitioner*s

v.

Michael S. Regan, U.S. Environmental Protection Agency; U.S. Environmental Protection Agency

*Respondent*s

------------------------------

CropLife America; State of North Dakota; State of Missouri

*Amici on Behalf of Petitioner*

California Rural Legal Assistance Foundation; Farmworker Justice; GreenLatinos; Labor Council for Latin American Advancement; League of United Latin American Citizens; Learning Disabilities Association of America; National Hispanic Medical Association; Natural Resources Defense Council; Pesticide

-2-

Action Network; Pineros y Campesinos Unidos del Noroeste; The Farmworker Association of Florida; United Farm Workers; United Farm Workers Foundation

*Amici on Behalf of Respondent*
_____

Petitions for Review of an Order of the
Environmental Protection Administration
_____

Submitted: December 15, 2022
Filed: November 2, 2023
_____

Before SMITH, Chief Judge, GRUENDER and STRAS, Circuit Judges.
_____

STRAS, Circuit Judge.

Facing a tight deadline from the Ninth Circuit, *see League of United Latin Am. Citizens v. Regan*, 996 F.3d 673, 703 (9th Cir. 2021), the Environmental Protection Agency banned the use of chlorpyrifos on food crops. Its decision was arbitrary and capricious, *see* 5 U.S.C. § 706(2)(A), so we grant the petitions for review and vacate its order.

I.

This is the latest round in the battle over chlorpyrifos, which has been waged behind the scenes for some time. To understand the stakes, we lay out some background information, including what chlorpyrifos does and how the EPA has regulated it.

## A.

Chlorpyrifos has played a large role in American agriculture for more than half a century. By 2017, just four years before the EPA banned its use, "it [wa]s the most widely used conventional insecticide in the country." *See* Chlorpyrifos; Order Denying PANNA and NRDC's Petition to Revoke Tolerances, 82 Fed. Reg. 16581, 16584 (Apr. 5, 2017). Its popularity was unparalleled because it stops harmful insects like caterpillars, beetles, and moths in their tracks without damaging crops.

But chlorpyrifos does not have a spotless safety record. Leftover residue can be harmful to humans, particularly at high levels. Historically, the EPA addressed the risk by setting "tolerance[s]" that limited the amount "in or on a food." 21 U.S.C. § 346a(a)(1). Different crops had different limits. *See* 40 C.F.R. § 180.342 (listing chlorpyrifos tolerances); *Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 168 (2d Cir. 2006) ("[A] separate tolerance (or exemption) must be established for each pesticide-food combination."). Turnip roots, for example, could have no more than 1 part per million. *See* 40 C.F.R. § 180.342(a)(1). The limits on turnip tops, by contrast, were stricter: 0.3 parts per million. *Id.* Before it decided to ban the insecticide altogether, the EPA had set specific tolerances for over a hundred different crops. *See* U.S. EPA, Interim Reregistration Eligibility Decision for Chlorpyrifos 3 (2002).

Chlorpyrifos also came in hundreds of different forms, each of which had to be "registered" with the EPA. *See* 7 U.S.C. § 136a; *see also Reckitt Benckiser Inc. v. EPA*, 613 F.3d 1131, 1133 (D.C. Cir. 2010). At one time, there were nearly 1,000 "registrations" for products containing chlorpyrifos. *See* U.S. EPA, *Agreement Reached Between EPA and Chlorpyrifos Pesticide Registrants* (June 6, 1997).

The tolerance and registration processes focus on product safety. *See* 7 U.S.C. § 136a(c)(5)(C) (authorizing registration of a pesticide only if "it will perform its intended function without unreasonable adverse effects on the environment"); *id.* § 136(bb) (defining "unreasonable adverse effects on the environment" to include

-4-

"any unreasonable risk to man *or* the environment" (emphasis added)); 21 U.S.C. § 346a(b)(2)(A)(i) ("The Administrator may establish or leave in effect a tolerance . . . only if the Administrator determines that the tolerance is safe."); *id.* § 346a(b)(2)(A)(ii) (defining "safe" as "a reasonable certainty that no harm will result from aggregate exposure to the pesticide chemical residue"). In 1996, Congress added a cushion above and beyond what it had required before: a "tenfold margin of safety for the pesticide chemical residue . . . for infants and children to take into account potential pre- and post-natal toxicity." 21 U.S.C. § 346a(b)(2)(C)(ii).

Before the EPA's 2021 ban, agricultural use of chlorpyrifos had survived multiple safety reviews. In 2002, for example, the EPA concluded that "[d]ietary exposures from eating food crops treated with chlorpyrifos [were] below the level of concern for the entire U.S. population." U.S. EPA, Interim Reregistration Eligibility Decision, *supra*, at 2. The same went for drinking-water levels, which were not a "concern." *Id.* Then, a few years later, the agency reaffirmed that existing tolerances met "the [tenfold] safety standard." *See* Memorandum from Debra Edwards, Dir., Special Rev. & Reregistration Div., Off. of Pesticide Programs, to Jim Jones, Dir., Off. of Pesticide Programs 1–2 (July 31, 2006).

B.

Environmental groups had a different view. Two petitioned the EPA in 2007 to have all tolerances revoked. *See* NRDC, Petition to Revoke All Tolerances and Cancel All Registrations for the Pesticide Chlorpyrifos (Sept. 12, 2007); *see also* 21 U.S.C. § 346a(d)(1)(A) (allowing "[a]ny person" to file a petition that proposes "revoking a tolerance"). They claimed that new studies showed that there was "no safe level of early-life exposure to chlorpyrifos." NRDC, *supra*, at 5, 11–13 (explaining that, although exposure was below a key safety threshold, researchers still saw adverse effects).

The EPA gave "due consideration" to the petition over the following decade. 21 U.S.C. § 346a(d)(4)(A); *see, e.g.*, U.S. EPA, Revised Human Health Risk Assessment for Registration Review 13 (2016) (reviewing additional studies that "support[ed]" the "results" cited by the environmental groups). It acknowledged that the groups had raised "risk concerns" about how chlorpyrifos impacted children, including through drinking water, but it was not sure what to do about it. *See League of United Latin Am. Citizens*, 996 F.3d at 717 (Bybee, J., dissenting) (quoting the EPA's March 2015 Provisional Response). So it explored two paths at the same time: "proposing to revoke all chlorpyrifos tolerances" while also "soliciting comment on whether it may be possible to retain some." Chlorpyrifos; Tolerance Revocations, 80 Fed. Reg. 69080, 69106 (Nov. 6, 2015).

Time eventually ran out. The environmental groups grew impatient and filed a petition for a writ of mandamus with the Ninth Circuit seeking an order requiring an immediate answer from the EPA. The court granted the petition and ordered the agency "to issue either a proposed or final revocation rule or a full and final response to the administrative petition." *In re Pesticide Action Network N. Am.*, 798 F.3d 809, 815 (9th Cir. 2015).

From there, the EPA moved quickly, but not in the way the environmental groups wanted. *See* Chlorpyrifos; Order Denying PANNA and NRDC's Petition to Revoke Tolerances, 82 Fed. Reg. at 16585–91. In denying the petition, the agency concluded that their objections were "not supported by valid, complete, and reliable evidence." Chlorpyrifos; Final Order Denying Objections to March 2017 Petition Denial Order, 84 Fed. Reg. 35555, 35557 (July 24, 2019). And even if some of the studies hinted at a link between chlorpyrifos and health problems, the agency still needed more time to "explor[e]" it. *Id.* at 35564.

C.

In the meantime, the EPA kept studying the "possib[ility] [of] retain[ing] some group of tolerances." Chlorpyrifos; Tolerance Revocations, 80 Fed. Reg. at

-6-

69106. Sure enough, in a new drinking-water assessment, it found that using chlorpyrifos on certain crops within specified geographic areas was "not likely" to result in harm. U.S. EPA, Chlorpyrifos: Proposed Interim Reregistration Review Decision 15–17 (2020) [hereinafter "2020 Proposal"]. The hope was to retain the tolerances under the tenfold margin of safety for 11 "high-benefit agricultural uses." *Id.* at 40–41; *see* 21 U.S.C. § 346a(b)(2)(C)(ii) (requiring the extra safety cushion).

This approach, to be sure, would create winners and losers. Corn and cucumbers, for instance, did not make the list, meaning that farmers growing those crops would have to find an alternative. *See* 2020 Proposal at 40; 40 C.F.R. § 180.342(a)(1) (listing corn and cucumber tolerances). Select farmers growing other crops, by contrast, would be among the winners. One example was Michigan cherry growers, who could continue to use chlorpyrifos even though cherry farmers from other states could not. *See* 2020 Proposal at 40; *see also* Chlorpyrifos; Final Order Denying Objections, Requests for Hearings, and Requests for a Stay of the August 2021 Tolerance Final Rule, 87 Fed. Reg. 11222, 11246 (Feb. 28, 2022) [hereinafter "2022 Denial Order"] (explaining that "[i]n order to conclude that cherry use was safe based on the 2020 [Proposed Interim Reregistration] proposal, the [registration] labels would need to restrict chlorpyrifos use to cherries only in Michigan"). Before adopting this middle-ground approach, however, the EPA opened a notice-and-comment period. 2020 Proposal at 62–63.

Once again, the environmental groups turned to the Ninth Circuit, which concluded that the EPA had acted arbitrarily and capriciously in denying their petition. *See League of United Latin Am. Citizens*, 996 F.3d at 700. In its view, the agency could only "leave in effect a tolerance (e.g., deny[] the 2007 [p]etition) if" it was "safe." *Id.* at 694. And the problem was that it had already acknowledged that, for some uses, the safety evidence was unclear. *See, e.g.*, Revised Human Health Risk Assessment for Registration Review, *supra*, at 13 (acknowledging that there are health problems "occurring at chlorpyrifos exposure levels below" what had previously been thought to be safe). The court gave the EPA an ultimatum accompanied by a 60-day fuse: either "revoke[] all chlorpyrifos tolerances" or

-7-

modify them if it could certify that "the tolerances so modified" were safe. *League of United Latin Am. Citizens*, 996 F.3d at 703.

Given the time constraints, the EPA all but gave up. It lamented, in fact, that it could have done more, particularly after it had found "limited combinations of uses in certain geographic areas that *could be* considered safe." Chlorpyrifos; Tolerance Revocations, 86 Fed. Reg. 48315, 48333 (Aug. 30, 2021) [hereinafter "2021 Revocation"] (emphasis added). Yet the short "window for issuing [a] rule" and the Ninth Circuit's "directive not to engage in additional fact-finding or further delay" meant it could only consider the information it had already "reviewed and incorporated into risk assessments and/or regulatory documents." 2022 Denial Order, 87 Fed. Reg. at 11236. And "[b]ased on the data available at th[e] time and the aggregate exposures," the agency was unable to conclude that the high-benefit agricultural uses were safe. 2021 Revocation, 86 Fed. Reg. at 48333. So "in compliance with the [c]ourt's order," the EPA ended the use of chlorpyrifos in the United States by revoking *all* tolerances. *Id.*

## II.

Now there are nearly two dozen agricultural groups asking us to weigh in. *See* 21 U.S.C. § 346a(h)(1) (providing for "judicial review . . . in the United States Court of Appeals for the circuit wherein th[e] [petitioner] resides or has its principal place of business"). Under the Administrative Procedure Act, we must determine whether the EPA's rushed revocation order was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). One way an agency can act arbitrarily and capriciously is by "fail[ing] to consider [an] important aspect of [a] problem" because it misunderstands "the full scope of [its] discretion." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1911–13 (2020) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

In this case, the EPA believed it lacked discretion, or at least acted that way. The Ninth Circuit's opinion had already narrowed its options down to two: revoke the tolerances or modify them. *See League of United Latin Am. Citizens*, 996 F.3d at 703. With little time to act, the agency ruled out the second option, *see* 21 U.S.C. § 346a, leaving only revocation by default. In doing so, however, it misread the statute and misunderstood the "scope of [its] discretion," *Regents of the Univ. of Cal.*, 140 S. Ct. at 1911, so we "set aside" its decision as arbitrary and capricious, 5 U.S.C. § 706(2)(A).

## A.

The question for the EPA was whether it could consider modifications along the lines it had proposed, which involved revoking most chlorpyrifos tolerances but retaining a few "high-benefit agricultural uses." 2020 Proposal at 40. The statute governing these types of decisions provides the answer. *See generally* 21 U.S.C. § 346a(b)(2)(A). And its "plain meaning . . . controls, . . . regardless of [the] agency's interpretation." *Hennepin Cnty. Med. Ctr. v. Shalala*, 81 F.3d 743, 748 (8th Cir. 1996).

Recall that any tolerance the EPA "establish[es] or leave[s] in effect" must be "safe." 21 U.S.C. § 346a(b)(2)(A)(i). Achieving the necessary margin of safety depends on whether the agency can determine to "a reasonable certainty that no harm will result from aggregate exposure to the pesticide chemical residue, including all anticipated dietary exposures and all other exposures for which there is reliable information." *Id.* § 346a(b)(2)(A)(ii). In this case, the EPA's task was to figure out all the different ways chlorpyrifos residue could reach people, sum them together, and then add the extra exposure from the tolerance under consideration. *See id.*; *see also* 2021 Revocation, 86 Fed. Reg. at 48327–32 (describing the agency's "exposure assessment"). If the assessment showed to "a reasonable certainty" that the "aggregate" amount would cause no harm, then "the tolerance [was] safe." 21 U.S.C. § 346a(b)(2)(A)(i)–(ii).

For our purposes, the most important part of the calculation is the "anticipated . . . exposure[]," *id.* § 346a(b)(2)(A)(ii), which refers to the amounts "expect[ed]" or "see[n] as a *probable* occurrence," *The American Heritage Dictionary* 77 (5th ed. 2016) (emphasis added); *accord Webster's Third New International Dictionary* 94 (2002) (defining "anticipate" as "look forward to as certain"). The EPA can typically expect current exposures to continue. *See* 21 U.S.C. § 346a(b)(2)(D)(vi) (stating that a "relevant factor[]" is exposure from the "other tolerances in effect"); *see also, e.g.*, Flonicamid; Pesticide Tolerances, 87 Fed. Reg. 30425, 30427 (May 19, 2022) (assessing exposures by "updat[ing]" existing findings "to include the additional exposure from [a] new use . . . and [an] increased tolerance [for another use]"). But not always.

When other tolerances are likely to change, determining "anticipated . . . exposures," 21 U.S.C. § 346a(b)(2)(A)(ii), requires looking at what is "expect[ed]," *American Heritage Dictionary*, *supra*, at 77. Sometimes it involves predicting exposures from additional uses. *See* U.S. EPA, General Principles for Performing Aggregate Exposure and Risk Assessments 45 (2001) (explaining that "proposed . . . uses," not just "approved" ones, should be used). Other times, like in this case, expected exposures will drop if the agency anticipates revoking existing tolerances.

Consider carbofuran, another "pesticide used to control insect infestations in a number of crops." *Nat'l Corn Growers Ass'n v. EPA*, 613 F.3d 266, 270 (D.C. Cir. 2010). The EPA discovered the aggregate exposure was "above [its] level of concern," so it revoked all tolerances, including some that agricultural groups urged it to retain "if all else failed." *Id.* at 270–71, 275 (citation omitted). The D.C. Circuit concluded that it was arbitrary and capricious for the EPA to cancel them all when it had "acknowledge[d] that exposure" from some of them "[wa]s safe." *Id.* at 275. The takeaway is that the EPA must consider arguments that less than a full ban would do.

The situation here is similar. Just months before the Ninth Circuit ordered it to act, the EPA had uncovered 11 high-benefit agricultural uses that were likely to

be safe if it revoked others. *See* 2020 Proposal at 40. And assuming the Ninth Circuit meant what it said—modify *or* revoke—the EPA had every reason to "anticipate[]" that it could revoke the other tolerances quickly. 21 U.S.C. § 346a(b)(2)(A)(ii). It is true that exposure levels might not have dropped immediately, *see id.* § 346a(l)(5) (allowing residue from a pesticide that was legal when it was applied); 2021 Revocation, 86 Fed. Reg. at 48334 (setting a six-month expiration date for the tolerances), but the EPA had every reason to "anticipate[]" it would happen before long. 21 U.S.C. § 346a(b)(2)(A)(ii).

Just like for carbofuran, a partial ban was a real alternative for the EPA. It could have cancelled some registrations and retained others that satisfied the statutory safety margin. *See Nat'l Corn Growers Ass'n*, 613 F.3d at 275. The agency might have needed to move more quickly than usual to confirm the safety findings and start the process of cancelling and adjusting registrations within the Ninth Circuit's deadline. *See* 7 U.S.C. § 136d(b), (f)(1) (providing for amendment and cancellation, both voluntary and involuntary); *see also id.* § 136(bb) (incorporating "the standard under section 346a" as part of the test for involuntary cancellation). But those are matters of policy and practicality, not statutory authority. The point is that the EPA should not have reflexively rejected an approach it had the power to adopt, even if it would have required more work.

B.

Pressed for time, the EPA concluded it had only one real option: revoke all tolerances and ban chlorpyrifos. *See* 2021 Revocation, 86 Fed. Reg. at 48333 (refusing to consider something less because the statute "requires EPA to aggregate all dietary and non-occupational exposures"); 2022 Denial Order, 87 Fed. Reg. at 11245–47 (concluding that "limit[ing] EPA's safety assessment to a subset of actual exposures based on a proposal would reflect an incorrect application of the statutory standard"). Its theory predetermined the outcome: "[e]xposures from [the 11 proposed] uses alone could not reasonably be considered as 'anticipated' since they did not yet (nor did EPA have reason to believe that they would) reflect the exposures

-11-

people would be exposed to in the real world." 2022 Denial Order, 87 Fed. Reg. at 11246. Without "a reasonable basis to believe that [other uses] w[ould] cease," it included them in the aggregate-exposure calculation and determined that no tolerance was safe.[1] *Id.*

It offered a few reasons for its approach. The main one was that *all* registrations were still in effect, including those the EPA planned to cancel regardless of the approach it chose. *See id.* Even for the high-benefit crops, chlorpyrifos was still in use in states where it posed a safety risk. *See* 2020 Proposal at 40 (suggesting that chlorpyrifos could be safe if limited to specific crops in certain states); 2022 Denial Order, 87 Fed. Reg. at 11246 (emphasizing "that [the] tolerances themselves . . . [we]re not limited in geographic scope"). What the manufacturers should have done, according to the EPA, was take preemptive action: cancel the registrations for high-risk uses and amend them for any high-benefit uses along the lines the agency had proposed. *See* 2022 Denial Order, 87 Fed. Reg. at 11246; *see also* 7 U.S.C. § 136d(f)(1) (authorizing voluntary cancellations).

The problem with this argument is that *the EPA* had an obligation to "anticipate[]" the effects of its own actions, regardless of what the manufacturers did. 21 U.S.C. § 346a(b)(2)(A)(ii). By the time the deadline approached, it knew that any tolerances it did not modify would be revoked, *see League of United Latin*

_____

[1]The EPA also argues for the first time that keeping the 11 high-benefit agricultural uses was not really an option because its earlier proposal was non-final and subject to "adjust[ment] or revis[ion]." It had said the opposite before, so we cannot rely on this explanation even if it could justify what the agency did. *See* 2022 Denial Order, 87 Fed. Reg. at 11241 ("EPA does not dispute its own scientific conclusions and findings in the 2020 [proposal] that the Agency could support a safety determination for the very limited and specific subset of uses identified in that document."); *see also Michigan v. EPA*, 576 U.S. 743, 758 (2015). Besides, the statute only requires "reliable information," not perfect certainty, and there is no dispute that allowing some uses to continue was consistent with the agency's extensive research and up-to-date safety information. 21 U.S.C. § 346a(b)(2)(A)(ii); *see also* 2020 Proposal at 6–8 (summarizing the review process).

*Am. Citizens*, 996 F.3d at 703, meaning that those uses would no longer be anticipated. *See* 21 U.S.C. § 346a(b)(2)(A)(ii); *cf. Nat'l Corn Growers Ass'n*, 613 F.3d at 275. And far from requiring registration holders "to take initiative," 2022 Denial Order, 87 Fed. Reg. at 11248, the EPA had the authority to act on its own. *See* 7 U.S.C. §§ 136(bb), 136d(b); *see also* 21 U.S.C. § 346a(l)(1) (requiring revocation orders to be "coordinate[d] . . . with any related necessary action under" the statute governing registration).

It is true that the short turnaround time complicated the EPA's task, and greater cooperation from registration holders could have sped up the process. *Cf.* 7 U.S.C. § 136d(b)–(c) (imposing time-consuming procedural safeguards for registration cancellations but allowing for immediate suspensions). But that is precisely why the statute allows it to anticipate the outcome of its own proceedings, including the possibility of retaining some tolerances and revoking others. *See* 21 U.S.C. § 346a(b)(2)(A)(ii). Certainly, it could anticipate what would happen under its own proposal to keep a set of high-benefit uses in place.

The difficulty of picking "winners and losers" was also no reason to ignore its own safety data. 2022 Denial Order, 87 Fed. Reg. at 11246. To be sure, there were "potentially multiple variations of the potential subset of tolerances that might meet the safety standard," meaning that the EPA would have to choose among multiple safe combinations. *Id.* But rather than making the choice itself, it instead followed its "general policy" of letting "pesticide registrant[s] and the public" sort out which tolerances and uses to prioritize. *Id.* However prudent that deferential approach might be without a strict court-mandated deadline, it kept the EPA from making a reasoned decision here.[2]

---

[2]To be clear, we express no opinion on whether adherence to a policy like this one, if properly supported and explained, would justify an agency's exercise of discretion under different circumstances. Here, the EPA did not rely on it as anything more than a backup explanation for its theory that it *lacked* discretion to retain any tolerances. *See* 2022 Denial Order, 87 Fed. Reg. at 11246; *see also State Farm*, 463 U.S. at 43 (explaining that a court "may not supply a reasoned basis for

-13-

C.

The EPA had to act quickly. But a short deadline is no excuse for zeroing in on a single solution to the exclusion of others. Its too-narrow view of its own authority kept it from "consider[ing] an important aspect of the problem." *State Farm*, 463 U.S. at 43; *see also Regents of the Univ. of Cal.*, 140 S. Ct. at 1911–13.

As the EPA itself acknowledged, it could safely retain some chlorpyrifos tolerances. *Cf. State Farm*, 463 U.S. at 51 (recognizing that agencies need not consider "every alternative device and thought conceivable[,] . . . regardless of how uncommon or unknown" (citation omitted)). In fact, before the Ninth Circuit declared that "time [was] up," *League of United Latin Am. Citizens*, 996 F.3d at 703, it seemed headed toward that solution. It had "solicit[ed] comment[s] on whether it [was] possible to retain some group of tolerances," Chlorpyrifos; Tolerance Revocations, 80 Fed. Reg. at 69106, and identified 11 specific candidates, 2020 Proposal at 40. After announcing that the "aggregate exposures" from them were "not of concern," *id.* at 19, it planned to consider whether "any [additional] limited uses [could] be retained," *id.* at 40 (inviting "registrant and stakeholder input on the subset of crops and regions").

The revocation order abruptly ended that process. And the reason was *not* new findings, a reevaluation of the evidence, or even a lack of time, but a misunderstanding of its duty to "anticipate" the "aggregate exposure" from its own proposal. *See* 2022 Denial Order, 87 Fed. Reg. at 11246–47 (explaining why, in the EPA's view, the statute mandated across-the-board revocation); 2021 Revocation, 86 Fed. Reg. at 48333. Under these circumstances, the EPA's decision to ignore modification as a possibility was "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A);

_____

the agency's action that the agency itself has not given" (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947))). Nor did it pin its decision on the alleged impracticality of performing a tolerance-by-tolerance analysis. *See State Farm*, 463 U.S. at 43.

-14-

*cf.* 21 U.S.C. § 346a(b)(2)(A)(i) (requiring the agency to "modify *or* revoke" unsafe tolerances (emphasis added)).

*     *     *

On remand, more than just modification is on the table. The agency remains free to exercise its discretion as long as it considers all "important aspect[s] of the problem" and gives a reasoned explanation for whichever option it chooses. *State Farm*, 463 U.S. at 43; *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) (summarizing what it takes to justify a change in policy, including "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy"); *see also Regents of the Univ. of Cal.*, 140 S. Ct. at 1916 (giving the agency a do-over). But this time, it must at least recognize the full scope of what it can do before announcing what it will not do. *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1911–13.

III.

We grant the petitions for review, vacate both the 2021 Revocation and 2022 Denial Order, and remand for further proceedings.

_____